Is it Mr. Navar? Amazingly, that's correct on the first try. That's the first time it's ever happened. And Ms. Petty? Yes. All right. Mr. Navar, you may proceed. Thank you, Your Honor, and thank you, Your Honors, for holding this argument today. Jared Navar for the plaintiffs, and may it please the court. The plaintiffs have made their case on the pleadings. Key to this appeal is understanding the timeline and then just simply applying the established law of standing and mootness to those facts. So as the record shows, the petition in this case was not organized by my client. My client wanted to pitch in as a volunteer to help collect signatures for it. That petition was announced in the city of Houston by the organizers around June 8th or 9th. June 12th through the 14th, my client was in Houston. He lives in Austin, but he was here in Houston on business with a copy of the petition form, and he's alleged that under oath that he was ready and willing to circulate at that time. He did not do so solely because the charter says that he can't do that, that any signatures he collected would be invalid, and he can't legally honestly sign the jurat that's required by the charter language. So he didn't, his speech was chilled on those three days while he was here in Houston with the form. He could not use it and circulate it. He contacted counsel. Our lawsuit, before the lawsuit was filed on June 24th, I reached out to the city's counsel. Those emails are in the record. That was June 20th. To let them know that, you know, I cited the two leading cases, Buckley and Meyer. I said we had to challenge this. Given the quick timeline, we'd have to seek emergency relief. I gave them the two cases that I think control the issue here and make the charter unconstitutional, unenforceable. And their response initially was, thank you for the heads up, and we're going to look into it. Over that weekend, that was on a did not, this is why this timeline is so important. The city did not disclaim any enforcement or admit that the charter was unconstitutional until at least several days later the following week. So we're talking June 24th or in their first filing after that. So that was a second period of time after I contacted the city and cited Buckley and Meyer, during which my client was here in Houston again, and again, unable to circulate. So the lawsuit was filed June 21st. And then what comes after that is not relevant to the issue of standing. All of that turns to mootness. And we'll get into mootness in a second. But first, the facts as alleged, and you have to take the facts as alleged, you know, the well pleaded facts of the complaint, because they were dismissed on the pleadings. The facts as alleged establish standing as of the time the suit was filed. And once standing is established, you can't be ousted of standing, you don't have to establish standing twice. And there's a little nuance with respect to stand, you do have to establish standing for each provision challenge, of course, and for each form of relief you're seeking. But at the filing of the suit to have standing for the case or controversy and as a whole, you just have to establish that you have a case or controversy against that provision that you're challenging. There's one provision at issue here in the charter. And so, and the plaintiffs asked for, of course, TRO, we asked for a preliminary and permanent injunction and nominal damages. So the question with respect to standing is simply was plaintiff Poole's fear of enforcement under the statute, fear of consequences if he were to circulate the petition at that time, was it objectively reasonable so as to support his self-censorship? And it clearly was under established law. The question as stated in Babbitt is, was the fear of enforcement imaginary, wholly speculative? If it was not imaginary, wholly speculative, then the fear of enforcement is reasonable. And Mr. Navar, in a motion to dismiss filed in June of 2019, the city said that it had not sought enforcement against anybody for violation of the resident requirement of the voter registration requirement in at least four years. How does that factor into our standing analysis? Right, right, Your Honor. And that, so you have to think of it, and this is where you go to the timeline, you have to think of it was, was my client objectively reasonable at the time he self-censored on June 12th through the 14th, and then again, you know, in the ensuing period as a lawsuit was filed. His, he had his personal experience, the 2014 for the ERO petition was the, the most recent time prior to this time that a petition was circulated in Houston subject to these, this charter provision that were challenging. And what did the city do at that time? This is what I've, you know, belabored in the brief to show that there was very aggressive enforcement actions taken by the city. Um, and, and, and pull himself, this wasn't just applied against another party pool himself was interrogated for five hours in that deposition. We've got those facts in the record and the specific questions in the record reflect that he was specific. The city was specifically trying to get at whether he had personally signed any juror ads and whether he was the one who was personally considered to be circulating the petition. And he, he knew the law at that time that he was not allowed to do that. And so he, he said he had not done it. Um, he was here to organize the effort at that time because he's a professional circulator and he has experience with that. So he helped volunteers who were registered voters at that time. Um, he didn't himself sign the juror ads, but so it was, it was very clear to him at that time from the city's own questioning in the deposition that they were very intent on enforcing this. And even though they've if you go back and look at the pages and the record we've cited in the brief and the reply, we've gone into detail where the city was aggressively challenging those petition pages and specifically on the basis of saying that certain pages should be invalidated. All the signatures on those pages because the circulator had not signed the petition as a registered voter. So that's the very provision we're challenging and the city, you know, Buckley now they're trying to say after the suit was filed, now they're trying to say, well, we, we reviewed Buckley. We recognize that we can't enforce that provision, but when the suit was filed, that was not their position. In fact, you know, 15 years after Buckley, Buckley came out in 1999 in 2014 is the time we're talking about when they put him in this interrogation and they, and they went to court and state court trying to throw out petition pages, including based on this specific provision. So, you know, that, that protestations of, you know, disclaiming intent to enforce came after the suit was filed. So that can't Alston upstanding. And aside from that, you know, when the city, the first time the city did come back and try to say, look, we recognize it's unconstitutional and we're going to go to city council and pass an amendment to, you know, help authorize nonresident circulators or something. What they said was, look, just take, just take the petition page. And this is in the record at 28 and 29. You have to remember my client came into this case as a volunteer, the organizers of the petition had already put this petition together, which has the charter required juror on it. And the city's response to us at that time was to say, look, we look, we read Buckley. Now, after you filed the lawsuit, we don't want to challenge these signatures. As long as you scratch through the section of that juror at required by the charter that says, I'm a, I, that I signed the petition and that I don't know which, what notary is going to know, is there a new updated petition form or is it, does it just have to be scratched through now? The, well, the petition form that they, that they claim they're not relying on, but the one that's linked on the city website now has been modified to take that phrase out. Um, and when we get into the mootness question, I can address why that's, is there a difference between the, I mean, Buckley said the voter registration requirement is unlawful. I'm not sure it directly addressed the residency requirement is, is, but is the city now saying both acknowledging both of those are unlawful? I, they've, well, I think they at least initially, um, they, I don't know what their position today will be. At least initially they tried to, um, kind of hedge on that and they wouldn't admit that the bear, a bear residency requirement would be unconstitutional. But the way that we argued it, and I think the court was right to find that the way it's, you have to be in the charter's language, you have to be a qualified voter to voter status. So there's no way to unwind that from the language in the charter. Has there been any discussion or attempt to just simply repeal the unconstitutional provision? Well, the city has, has specifically disclaimed. They've, they've argued in their briefs that they shouldn't be held responsible for this thing being in the charter still because, um, it's so hard to amend. You know, you have to, in order to amend the charter, you have to go to the voters and there has to be, even if the council itself can put it on the ballot, but you have to have an election of the voters of Houston and they have to approve that amendment. Uh, it's like a Texas constitutional amendment in that, in that sense. Um, so they've, they've sort of relied on that and said, look, it's too hard to amend the charter anyway, so we shouldn't be held liable for the fact that it remains in the charter. And of course, that's not, that's not the plaintiff's problem either. Um, so they could amend it. You know, the city council has never tried to. And in fact, the last time this came up again, every, every day until this lawsuit was filed, there was no indication that the city would adhere to Buckley, which had been decided 15 years before 2014. And in 2014, when that petition came up on the ERO, they aggressively enforced it. They sent 14 lawyers to, to state and federal court in Houston. Um, and, and my client was interrogated for five hours in the circulators. Um, so the standing, the standing is clear. And again, to finish my point on, you know, there, even when they did recognize the way to Buckley and try to disclaim enforcement, it wasn't just a straight, you know, they, they would never agree to, um, any sort of stipulated order that says, look, this is unenforceable, which would protect my clients, both from the city's enforcement and from third parties who might try to challenge the signatures in court, which happens in Texas. Um, what they tried to do was say, look again, they said, well, look, just, just take a pen and scratch out that language of the jurat and sign it and go get it notarized with it modified like that. I'm not sure a notary would sign that in the first place. Um, but they also said, you, we also want you to sign this, um, additional, you know, consent to jurisdiction form as a non-resident circulator, which would require them to give up their rights at the time. It would require them to come within 48 hours of a request by the city at their own expense, regardless of where they were. Um, you know, when a question on signatures supposedly comes up, if the city itself requests it, they have to make themselves president Houston within 48 hours and, and be ready to answer any questions completely, um, untethered to any service or process, or even any civil or administrative proceeding, the city could just I suspect we may talk about that a little more later in this argument, but you know, that's an important point too, even if, you know, so there were Stan, the facts established standing at the beginning of the case when it was filed, but even if you accept their later protestations, it still doesn't solve the problem. Um, and so there were at least two the injury here on, on injury. In fact, the act of petitioning itself, regardless of whether you collect enough signatures, um, involves core political speech as recognized in Buckley and, and Meyer. And so the act of having those conversations and then the act, the legal act of, of signatory signing your petition as a circulator, um, is, is also a first amendment activity that's of any petition to get something on the ballot. Why isn't what they have on the website now, even though it's, it's not clear whether they're really embracing that or relying on that, but why isn't, why doesn't that show that they've, whatever the history is, they've now recognized the problem with the law and they've changed the form and future enforcement is not a real concern. Well, I will, I'll say this. It, my belief is the case should be remanded and the district court has to make that determination of whether, you know, that is a question of, of whether the facts are such that would support injunctive relief in addition to a declaration. But the case for prospective relief, including a declaration is not moved because the city hasn't met their burden that, that, that, that, that substitute procedure that they disclaimed here on this appeal anyway. But even if you consider it, it's not sufficient because one, it's not, it's not an official act of the city. The city to this day has never said the date that that was approved by whom it was approved, whether it was approved by the city council. Um, and as, as we pointed out in all these cases on voluntary cessation, uh, the city can't, the courts routinely reject this argument of voluntary cessation where the offending provision remains unrepealed. So if they really wanted to move the case, they could try to put it on the ballot and repeal this provision, but it remains in the charter. Uh, and so they can't meet that burden to show the cases moved, even for prospective relief. Um, and then even, you know, even if they could, um, we, we clearly meet the standard in this election context for the capable of repetition exception to All right. Thank you, Mr. Navarro. Your time has expired. Thank you. Apologize, your honor. We, uh, we got cut off. So I missed about, uh, probably about the last seven minutes of his argument. Um, may please court, excuse me. Uh, the part that I heard, uh, indicated that he is not accurately representing the record nor the applicable law. So I'd like to address that and focus on two aspects of standing. Uh, this case isn't governed by its timeline and the timeline he is, uh, separated at no point ever in this litigation that the city ever give him any indication that we would intend to force intent to enforce the provisions that were, uh, declared unconstitutional in Buckley. The fact that we enforce the other provisions that remain, uh, in 2014 and even in 2019, if it had come up, uh, are really not relevant, uh, except the fact that his chill was subjective. So let me address the questions of standing. Do you agree that Buckley encompasses a residency requirement as well? I think that was one of the points made by counsel. And I don't know if you had heard that part or not. Uh, would you agree with his characterization of the Buckley holding? That that's about the time that I got cut off. I think what Buckley does is Buckley cut off the register, the registered voter requirement for the circulators. Uh, and that refers to a qualified a, um, uh, a residency requirement. We didn't make an issue of it. I think we dropped a footnote in our brief that said that although it's really not an issue in the case, um, you know, probably that's going to be the case that that goes to, but we're not certain. But the, uh, the provision of the charter also deals primarily with signatories. And that, for example, was the focus of the 2014 that Mr Poole was so concerned about the focus. If you look at the evidence in the case, and I encourage the court to look at our factual statement, which puts this out in pretty good detail, including Mr Poole's testimony. The focus of the litigation was on the people who signed it. There was no effort to, uh, to charge any of the circulators. And in fact, it was kind of a mess. As we indicate in our brief, the advocates themselves pulled 24,000 signatures off is incorrect. So it was kind of a debacle. But nevertheless, during that 2014 debacle, and it was a high profile attempt to battle over the attempted repeal of the Equal Rights Ordinance, it was on the form that you needed to be a registered voter, right? And my understanding is it was on the petition form until this litigation that you had to be a registered voter. Your Honor, I think I think that that that the old form, I think they may have put that as one of their exhibits in the record, and it was on there. But I would I would turn the court's attention to this. And that is is that there is not any evidence in this record that any signature was rejected solely for the reasons that were declared unconstitutional in Buckley. They may have been on another list of 15 different things, but it just seems problematic to me. It's on a form. I mean, you talk in your brief about these zombie laws, and there's tons of them on the book. So I think it's it's certainly not enough just that some law is on the books and has never been repealed because there's tons of those that are now unconstitutional and are on the books. But it does seem different when it's on the form itself. So why wouldn't a reasonable person? Now, you know, maybe you can argue now you've changed it on the website, but at least when that form was in existence, why wouldn't a reasonable person think, wow, it's still on the form? I don't want to lie. I don't want to sign something and lie. Your Honor, I appreciate that. Two things. Number one, the form is in the charter. It is not something that we promulgated based on a charter provision. It is it is set forth in the charter. Number one. Number two, how can you change it now without a change to the charter? We have basically we've done with that provision basically what we do with all provisions that become unconstitutional. We try to work around it as best we can and say, here's what we will accept. The second thing, though, is in this case, it doesn't really matter what another person would have thought because Mr. Poole knew in 2014 that those provisions could not be enforced constitutionally. And that's that's I think a large part of the problem here is that, you know, the the idea that somehow he could be chilled by something that we could never successfully enforce. For example. Couldn't he be charged with lying on the form? Even in other words, even if you're asking people to lie on the form, oh, I know it's I can lie even I'm not a registered voter because I know that requirement is. You see the document and put someone in, even if they think it's unconstitutional, they have to if they're being asked to. I understand, I understand that, and that's why we simply said cross out those provisions, and obviously we're not going to require that anybody lie. And if somebody wants to make misrepresentations on a form, that's a separate problem. But they can simply say no, I'm not one. And if they ask us before they file a lawsuit, which Mr. Poole did not, we would tell them that that's that's what we would accept. And we can accept signatures now, even though that's what they what the form that is specified in the charter says. I think he was correct in the fact he was incorrect in his characterization of how it works. We have to have a vote of citizens in order to get rid of a charter provision. We can't just go in and change this and amend it by city council ordinance. And I think part of the reason that we're still in this involved in this lawsuit is that Mr. Poole has not comprehended that that this is not something we can just snap our fingers and fix. And I appreciate the dilemma that it creates for the citizenry, but the likelihood that it will be about it is pretty low. I'd like, though, to get back to the issues in the case, because I think the law has kind of gotten lost today in a lot of the facts. And the law, I think, here is pretty clear. One that you have to have for perspective relief. He's talked about an to the city. That was fine for his temporary injunctive relief. But if he wants injunctive relief prospectively, a permanent injunction, and particularly if he wants it for third parties, then he's got to do something else. He's got to show that there is a threatened injury that is certainly impending a substantial risk that the harm will occur and a credible threat of enforcement. And here there has been exactly the opposite. Houston has judicially admitted that we will not enforce those provisions. We have cited to numerous places in in the record and in open our statements in open court where we have said we have no present intention to do that. I'm looking at a picture that's frozen. Am I frozen? Can you still hear me? I can hear you. Okay, thank you. And so pool doesn't really acknowledge the distinction between, you know, our judicial admission and some ability to just snap our fingers and make this go away. Second, in the poll case that we've cited in our brief from the U.S. Supreme Court, they say if you have that kind of disclaimer, which we did, then that moves the case. That's the end of the case. But I think also, too, and this is the problem that Judge Costa has talked, is when you have a law that is unconstitutional, the idea that we have got to have it declared unconstitutional is wrong. Let me give you a perfect example, and it will take it out of the context of this case where I think you can see it better. We currently have an appeal. The court can take judicial notice of the Pigeon Appeal, where we have a charter amendment that has not been enforced since 2013. One of the citizens of Houston wants to enforce that, and we are saying, no, we can't because it was declared unconstitutional in Windsor and Obergefell. If you take the position of the appellants in this case, they would require, before we could ever provide same-sex benefits, for there to be a declaration that that was unconstitutional, rather than what we did is simply advise the mayor that that was the case. And he could go around the country to all of the DOMA laws, to all of the cities that have individual DOMA laws, and say, well, you have the option to enforce this if you want until it's declared unconstitutional. I'm going to get fees in all of these cities to do so. That's madness. So, what the city does, which all cities pretty much do, is they monitor the case law to see, you know, if our ordinances and our charter amendments are still in compliance when they're not. We've lost you, Ms. Petty. She dropped off. We're trying to get back. Let me just, all right, we're back. And when they're not, we don't enforce them. The second thing, aside from our judicial admission that we are not enforcing this, Mr. Poole knew since 2014 that the provision was unconstitutional and couldn't be successfully enforced. And therefore, there's no way that he could have a reasonable belief that he would be put in jail or prosecuted for that. His subjective chill isn't sufficient. And the Laird case has said that. Mayor allegations of that aren't. It also says that you need some sort of concrete statement in order for it not to be a subjective chill. You need some sort of that they are going to enforce it. You can't just have some belief based on what you thought happened many years ago. And I think, again, I refer the court to the evidence that we put in our brief that shows that he had a very tangential involvement in that case. And so he, I don't think really knew what the focus of that litigation was. The third thing that I think is problematic is that having something simply remaining in the charter is problematic. That's not enough for them to have any kind of appropriate meeting of Babbitt standards. Poe says that just the mere existence without a real threat of enforcement is wanting. So the problem that they have is there has never been a credible threat of future enforcement, which they need for third parties. I'd like to turn briefly to redress ability. And just before I leave that, those same kind of standards apply to both mootness and to mootness and to injury. In fact, for standing purposes, the court really, however, I think decided this case on standing purposes in its original order. It said that no injury, in fact, had been established for any person for prospective relief. It said that that in the order on the motion to amend the judgment, that the situation hadn't changed, that the plaintiff could no longer demonstrate that they suffered any concrete injury. And so they had to show them some injury, in fact, in the future and redress ability. And I've talked about injury, in fact, a good bit. You brought up the district court's ruling. It seems to me that would have also prevented even the T.R.O., even the relief that was given. If you're right, that this is just an unconstitutional law that's been on the books, but there's no there's no real threat of enforcement. Why was then there standing for any relief in this case? I think I think the court, frankly, was was trying to be be generous because it was a very short duration. And second, I think that the court was doing probably the regular legitimate chill, then that based on past conduct, then that would get you to temporary relief. It would not get you to prospective relief. So she might have been correct. I don't think she was, but she might have been correct for the temporary relief, but not for the prospective relief. And in fact, she said that, you know, I found it for this temporary restraining order, but I don't yet find it for the prospective relief. And I think that was probably a pretty a pretty conservative thing to do. And she understood that under Laidlaw, you have to do it for you have to have standing for each kind of relief. And so you had it for temporary relief. You had it for prospective relief and you had it for nominal damages. So I want to T.R.O. seems like it's still it's perspective for a very short time period, but it seems to me it's still perspective as opposed to say damages, which are a retrospective backward looking. Yeah, I'm not. I'm not sure. I don't know that I necessarily agree with that. I think what she was saying in that is that I and she said it in her order that I found a past a past injury. And therefore, I am going to hold this for for this particular period of time until July the 9th, and then I'm done. And let me just say here, I have a blank screen in front of me. And so I don't know what my time is. So if someone on the court that's that's fine. Thank you. I'd like to. Did I answer your question? You can go ahead to your next points. OK, I want to make sure I'm responsive. The last issue I think I want to talk about today is the redress ability on the nominal damages. You know, nominal damages claims they talk about surviving mootness only if they're otherwise viable. And in this case, they really weren't. Even if you assume the injury that we talked about that the court found for the temporary restraining order, it still has to be an actual remedy for that injury. The relief provided as nominal damages. And in this case, the appellants have expressly negated that element of standing with their nominal damages claim. They swear that the speech that their speech was chilled by the continued presence in there. They have sworn that so long as the provisions are not joined and declared unconstitutional, their speech will remain chilled. And as a consequence, they have basically negated that element of standing. And so their claim for nominal damages can't stand, even if you kind of give them a little bit that they didn't completely negate it. It's still an incidental claim to their their main claim, which is the claim for the claim for prospective relief. That's what they want. And I think you can even ask measure in the at the end, you know, if if he would be happy with a dollar but nothing else, I think he probably would, because we have another. He has another case in the Fifth Circuit for his fees. But even on that score, I think it's inappropriate for a plaintiff basically to come in and pick low hanging fruit, something that's already unconstitutional, that's not enforced and say, look, you know, we're going to, you know, I want to declared unenforceable and I want you to give me what is it, 70 or $80,000? And what is what? What assurance do the appellants have that it will never be enforced again? What does that ensure? What does that assure? It's it's been declared unconstitutional. And it can. Let me ask. Let me say this. It can never successfully be enforced again. I can't. I don't have to hire. But that doesn't mean somebody won't have to hire a lawyer and spend money to defend against it. Well, but I declared unconstitutional. I am. But trust me. No, I understand that. And that's that would be of concern. But I think that, number one, it's we've publicized it as well as we can. We can't get rid of the provision. With that's up to the voters of Houston. And it's kind of ironic that that Mr. Poole, who collects signatures, hasn't collect signatures to get rid of this, but instead has filed a lawsuit. But more important, there's there's no reason. When you say it's been declared unconstitutional, so then you were agreeing that Buckley does away with both of registered voter requirement and the residence requirement. Are you agreeing with that? Are you saying that some other case that declared them both? No, if I if I wasn't clear, let me let me make clear. It does away with the registered voter provision of the of the of the charter provision. We assume that the residency requirement is also went with it because of the kind of when you look back at what is a qualified voter, there's a residency requirement. So we assume that that's gone in. So we probably will not enforce that for circulators. However, it doesn't explicitly declare the residence requirement on Constitution. It does not. But again, we have the ability when we I mean, what the city does is we don't enforce things when we feel like they've become unconstitutional. And so we always try to err on the side of the citizen. And that is is that if if it looks like that could be unconstitutional, then we're not going to enforce it, even if technically we could. And we do that in the pigeon case I've given you. We've done that. So this administration changes that policy is just going to go forward with the new administration. There's some assurance that that can happen. No, Your Honor, it's not a policy change. And I think that's an important point because Mr. Poole has tried to suggest that or the Poole appellants have tried to suggest that somehow this is a policy of the city. Like hundreds of thousands of cities, towns, states, counties, we have these zombie provisions and they aren't enforced because the city has a trying to enforce something that is not enforceable. That's going to result in a lawsuit. And you've got a Supreme Court case out there saying that it's unconstitutional. That doesn't make a whole lot of sense. And we Texas, but sometimes here in Mississippi, our legislature passes laws that seem obvious to lots of other people to be unconstitutional. They get passed anyway. I hear what you're saying about Texas and your time has expired. So I'll give you a brief opportunity to sum up. Can you hear us? Ms. Penny, you're on mute. I don't see her at all anymore. I'm asking to unmute, but it looks like our camera turned off again. Okay. Joseph? Don? Yes. Any suggestions for Ms. Penny? We lost her. Yeah. She dropped twice already. Well, her time had actually expired. I'll give Mr. Nabar an opportunity for a rebuttal. If she comes back, I'll give her a chance to sum up. So Mr. Nabar, rebuttal. Okay. Thank you, Your Honor. And first, just as a general matter, I think we need to this whole argument about these zombie laws, the fact that the Supreme Court decides an issue, for example, strikes down the campaign finance restrictions in Buckley in 1976, that doesn't mean that plaintiffs don't get to challenge and get declarations of unconstitutionality of all the provisions and campaign finance laws that violate the principles and the reasoning of Buckley that are litigated later. Catholic leadership, I was a plaintiff's leadership decided by this court a few years ago. We sued Texas. The laws that they struck down, they found were invalid, under precedent from the Supreme Court from 20 and 30 years ago. That doesn't mean that it's not justiciable. That's a separate provision. Don't you need to show some threat of enforcement beyond just that the laws are on the books? Because otherwise, I mean, it's a tragic thing, but a lot of states still have a number of century plus old segregationist laws on the books. And, and I don't think courts have said, oh, you can, you know, even though there's, there's not been a threat of enforcement for decades, you can come in, sue, get attorney's fees to declare all these old laws valid. I mean, is your argument that just having an unconstitutional law on the books gives you the right to go into court and get a relief against it? Well, no. And let me, you know, emphasize this again, because the cities, the cities look back and trying to minimize what happened in 2014 with the ERO petition is, is quite frankly, just revisionist history. And I've cited those pages. Those are all in the record. We took their litigation documents, their motion for summary judgment, and their plea to the jurisdiction. And, and if I could only summarize certain parts of it here, but if you look at, and I've taken the parts that show exactly what I'm saying, but they go on for pages, alleging these, these circulators engaged in what they called election fraud, which is a, which is a crime. And, and, and they did try to get all these pages thrown out. They did try to get thousands of signatures thrown out specifically because the circulator did not sign the petition as a voter. And that's the petition we're challenging. That was in 20, when is the last time that occurred? Well, that was the last time they had an opportunity to enforce it, which was that, that ERO petition in 2014. And even though, so now this is why I'm saying you have to focus with respect to standing. You have to focus on the timeline very closely because their, their representations after suit was filed. And after my plaintiff was already injured and chilled his speech, don't can't go back and rectify that injury. That injury is already actualized. You don't even have to have injury actualized under the first amendment pre-enforcement challenges, but my client self-censored twice before the suit was filed. And so that's actually actualized injury that can never be rectified. But what, what Ms. Petty is talking about now is saying she tries to, to, to represent that the city, she said, they, they sort of rove the, the code book in light of recent decisions, and they put something on the website to say, to disclaim their intent to enforce it. That came weeks and weeks after this suit was filed. That, and this is what I'm saying. If you go in their briefs, they never say the date that that was put on there, but the first time they raised it was in response to our rule 59 motion after the case was already dismissed on the pleadings. That's when they put that, that new affidavit on the website after the case was already dismissed. So far after plaintiff, you know, plaintiff's speech was chilled and after we got the injunction. So, you know, for them to say, well, we try to work around it. We try to in 1999, the Euro petition was 15 years later and they, they interrogated Mr. Poole personally for five hours in that deposition. And the record, uh, it's around page, uh, record 238, 239, 241, right around that. We've cited them in the brief and the reply, all the litigation documents, which, which just belie the city's argument, uh, at this point. So, and just, you know, the next major point, first of all, two of them on mootness. Once standing is established under car under Davis versus FEC. It's absolutely clear. The only way they can argue non-justice ability is, is that the case is moot and it becomes their burden to prove that it's moot under the Texas versus EEOC standard this circuit in 2019, which is a heavy burden. Uh, and they, they haven't met it because the statute is so this is different from the standing inquiry. And this is really a critical point, which they try to ignore all throughout the case. This is the only way they can escape the standard review. They have to show that it's, it's, you know, uh, virtually certain that this cannot recur and under justice versus Hoseman, um, which was a Mississippi case as well from a few years ago, that if you read that case, uh, 291, 294, they cannot establish that that standard. In that case, the court found that it's, it's, it's almost exactly like the situation here. It's a chilled speech claim, the election at issue past that, that generated the lawsuit. And the court found in that opinion, that just because the plaintiffs had alleged, you know, general intent to engage in future petition activities in the future, they didn't have a specific petition identified or anything like that. It's exactly like here. Our plaintiffs have said, you know, we've got a history of petitioning activity and we want to do future petition. Your time is expired. Thank you very much. Court will take this matter under advisement and Mr. Navar, you are free to leave. Thank you, Your Honor. All right. Thank you.